**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DARRYL J. MADISON,<br>MALIK F. EUGENE,<br>YVETTE MADISON,<br>MARLESA J. BROWN, and<br>MADISON & SONS<br>ENTERPRISES d/b/a<br>MADISON TAX SERVICES,<br><br>    Defendants. | Case No. 8:25-cv-116 |

**COMPLAINT FOR PERMANENT INJUNCTION**

1. The United States of America brings this action to permanently enjoin Darryl J. Madison, Malik F. Eugene, Yvette Madison, Marlesa J. Brown, and Madison & Sons Enterprises d/b/a Madison Tax Services ("Defendants") and anyone in active concert or participation with them from:

    a. Preparing, assisting in the preparation of, or directing the preparation of federal tax returns, amended returns, or other tax-related documents and forms, including any electronically submitted tax returns or tax-related documents, for any entity or person other than themselves;

    b. Filing, assisting in the filing of, or directing the filing of federal tax returns, amended returns, or other tax-related documents or forms,

1

including any electronically submitted tax returns or tax-related documents, for any entity or person other than themselves;

c. Owning, operating, managing, controlling, working for, profiting from, or volunteering for any individual, business or entity that prepares or assists in the preparation of tax returns, amended returns, or other tax-related documents or forms, including any electronically submitted tax returns or tax-related documents;

d. Using, maintaining, renewing, obtaining, transferring, selling, or assigning any Preparer Tax Identification Number ("PTIN") and Electronic Filing Identification Number ("EFIN");

e. Using a PTIN, EFIN, Employer Identification Number ("EIN"), Taxpayer Identification Number ("TIN"), Social Security Number ("SSN") or any other federally issued identification number that belongs to another to file or remit federal tax returns;

f. Allowing others to use an EFIN, EIN, TIN, PTIN, or any other federally issued identification number to prepare or file federal income tax returns;

g. Assisting in, or financially benefitting from, the preparation of federal tax returns;

h. Engaging in activity subject to penalty under 26 U.S.C. §§ 6694, 6695, or 6701; and

i. Engaging in conduct that substantially interferes with the proper administration and enforcement of tax laws.

2. The United States also seeks an order for disgorgement of ill-gotten gains from the Defendants' preparation of federal tax returns.

## Authorization

3. This action is requested and authorized by a delegate of the Secretary of the Treasury of the United States and is commenced at the direction of the Attorney General of the United States pursuant to 26 U.S.C. §§ 7402 and 7408.

## Jurisdiction and Venue

4. This Court has jurisdiction pursuant to 26 U.S.C. § 7402(a) and 28 U.S.C. §§ 1340 and 1345.

5. Venue is proper in this Court under 26 U.S.C. §§ 7407(a), 7408(a), and 28 U.S.C. § 1391 because the Defendants' principal place of business is within this district, the Defendants prepare tax returns in this district, the Defendants reside in this district, and the events giving rise to this claim occurred within this district.

## Defendants

6. Darryl J. Madison resides in Brandon, Florida. He has been preparing tax returns for others for compensation since around 2003. In addition to preparing tax returns, Madison employs, through his company Madison & Sons Enterprises d/b/a Madison Tax Services ("Madison Tax Services"), one or more persons who prepare tax returns.

7. Malik F. Eugene resides in Tampa, Florida. He has been preparing tax returns for others at Madison Tax Services since around 2017.

8. Yvette Madison resides in Tampa, Florida. She has been preparing tax returns for others at Madison Tax Services since around 2015.

9. Marlesa J. Brown resides in Tampa, Florida. She has been preparing tax returns for others at Madison Tax Services since around 2015.

10. Madison & Sons Enterprises d/b/a Madison Tax Services is a tax preparation business located in Tampa, Florida.

### Background

### *Madison & Sons Enterprises, LLC*

11. Madison and & Sons Enterprises, LLC does business as Madison Tax Services and prepares tax returns for paying customers.

12. Madison Tax Services was registered with the State of Florida on August 20, 2009.

13. Defendant Darryl Madison is the sole owner of Madison Tax Services.

14. Tax return preparers at Madison Tax Services prepare tax returns using the EIN belonging to a political campaign to sign returns.

15. Preparers at Madison Tax Services file tax returns utilizing the EFIN belonging to KA USA Investment & Development, a company operated by Madison's wife.

### *Defendant Darryl J. Madison*

16. Darryl J. Madison is the owner of Madison Tax Services.

17. Madison received an associate degree in accounting from College of the Desert-Palm Springs in California.

18. Madison graduated from Fordham University with a bachelor's degree in marketing and management.

19. Madison also obtained a degree in computer software from Hillsborough County College.

20. In 2003, Madison started working at his father's tax preparation business, then called Paramount Celebrity and later changed to Madison and Sons Enterprises, LLC. He ultimately took over the business.

21. Madison & Sons does business as Madison Tax Services.

22. Madison's tax training was through the IRS updates and annual updates. He has participated in due diligence testing from Refund Advantage and Intuit. He attended tax seminars between 2017 and 2019 in Orlando, Florida.

23. The IRS mailed Madison multiple letters between 2013 and 2017, notifying him of errors with the returns he prepared and/or filed for his paying customers. For example:

   a. On January 2, 2013, the IRS notified Madison that a large number of tax returns he prepared for the 2011 and 2012 tax years contained errors.

   b. On November 13, 2013, the IRS notified Madison that a large number of tax returns he prepared for the 2011 and 2012 tax years contained errors.

   c. On October 7, 2014, the IRS notified Madison that a review of tax returns he prepared for customers for the 2013 tax year indicated he may have inaccurately claimed Earned Income Tax Credits for his customers.

   d. On September 21, 2015, the IRS notified Madison that a review of tax

returns he prepared for customers for the 2014 tax year may have contained inaccuracies, including questionable income and expenses on a Form Schedule C, Profit or Loss from Business.

e. On September 26, 2017, the IRS notified Madison that a large percentage of tax returns he prepared for customers for the 2016 tax year claimed wage income without W-2s to support the claims, indicating he may not have met his due diligence requirements.

24. Between 2014 and 2016, the IRS received complaints from customers about the return preparation practices at Madison Tax Services.

25. The complaints alleged that Madison falsified claims on tax returns, understated customer taxable income, and failed to provide taxpayer with support when taxpayers were audited by the IRS and sought assistance to rectify errors.

26. On August 12, 2019, the IRS assessed penalties against Madison under 26 U.S.C. § 6694(b) for his willful or reckless conduct in preparing tax returns in 2015, 2016, and 2017.

27. The IRS notified Madison of the penalties. Madison has not stopped or corrected the improper return preparation practices as a result of the assessed penalties. The penalties remain unpaid.

28. Anyone who prepares or assists in preparing federal tax returns for compensation is required to have a valid PTIN assigned by the IRS.

29. A PTIN is used to identify an individual tax return preparer on the customers' tax returns. The IRS maintains a database of tax return preparers and their

PTINs.

30. Paid tax return preparers are required to identify themselves as the preparer on all federal tax returns that they prepare for compensation by signing their name and reporting their PTIN on each return. *See* 26 U.S.C. § 6109. Between December 31, 2022 and January 23, 2024, Madison used an expired PTIN on the returns he prepared.

31. In the following years, Madison prepared and/or filed the following number of returns for others under his SSN and PTIN. He also prepared and/or filed an unusually high number of returns claiming refunds, as follows:

| Filing Year | # of Returns | # of Returns Claiming Refunds | % of Returns Claiming Refunds |
|---|---|---|---|
| 2024 | 566 | 505 | 89% |
| 2023 | 313 | 276 | 88% |
| 2022 | 241 | 218 | 90% |
| 2021 | 247 | 229 | 93% |
| 2020 | 307 | 277 | 90% |
| 2019 | 244 | 187 | 77% |

*Defendant Malik F. Eugene*

32. Malik F. Eugene is an independent contractor at Madison Tax Services.

33. Eugene is Madison's nephew.

34. Eugene started working in data entry for Madison Tax Services in 2016. In 2017, he began preparing and filing tax returns for customers at Madison Tax Services.

35. Eugene learned how to prepare and file tax returns while working at Madison Tax Services.

36. In the following years, Eugene prepared and/or filed the following number of returns for others under his SSN and PTIN. He also prepared and/or filed an unusually high number of returns claiming refunds, as follows:

| Filing Year | # of Returns | # of Returns Claiming Refunds | % of Returns Claiming Refunds |
|---|---|---|---|
| 2024 | 267 | 234 | 87 % |
| 2023 | 383 | 339 | 88 % |
| 2022 | 349 | 318 | 91 % |
| 2021 | 326 | 308 | 94 % |
| 2020 | 252 | 245 | 97 % |
| 2019 | 196 | 190 | 96 % |

*Defendant Yvette Madison*

37. Yvette Madison is an independent contractor at Madison Tax Services.

38. Yvette Madison is Madison's sister.

39. Yvette Madison learned how to prepare and file tax returns while working at Madison Tax Services.

40. Yvette Madison participated in due diligence testing from Refund Advantage and Intuit Pro Series.

41. In the following years, Yvette Madison prepared and/or filed the following number of returns for others under her SSN and PTIN. She also prepared and/or filed an unusually high number of returns claiming refunds, as follows:

| Filing Year | # of Returns | % of Returns Claiming Refunds | % of Returns Claiming Refunds |
|---|---|---|---|
| 2024 | 157 | 143 | 91 % |
| 2023 | 358 | 319 | 89 % |
| 2022 | 419 | 392 | 93 % |
| 2021 | 354 | 320 | 90 % |
| 2020 | 280 | 258 | 92 % |
| 2019 | 304 | 277 | 91 % |

*Defendant Marlesa J. Brown*

42. Marlesa Brown is an independent contractor at Madison Tax Services.

43. Brown is Madison's daughter.

44. Brown took Enrolled Agent courses with Intuit and Money Tax.

45. In addition to working at Madison Tax Services, Brown is employed by another tax preparation service as a Tax Lead consultant providing online support to customers.

46. In the following years, Brown prepared and/or filed the following number of returns for others under her SSN and PTIN. She also prepared and/or filed an unusually high number of returns claiming refunds, as follows:

| Filing Year | # of Returns | % of Returns Claiming Refunds | % of Returns Claiming Refunds |
|---|---|---|---|
| 2024 | 71 | 63 | 88 % |
| 2023 | 243 | 210 | 86 % |
| 2022 | 455 | 390 | 86 % |
| 2021 | 563 | 511 | 90 % |
| 2020 | 542 | 478 | 88 % |
| 2019 | 430 | 397 | 92 % |

**Defendants' Tax Preparation Business**

47. The Defendants are paid tax return preparers as defined by 26 U.S.C. § 7701(a)(36).

48. The Defendants charge their customers for tax preparation services.

49. In return, the Defendants prepare false returns that claim tax refunds for customers who would otherwise not be entitled to them or inflate tax refunds for customers who would otherwise only be entitled to lower refunds.

50. The Defendants deduct their return preparation fees directly from their customers' refunds.

51. As shown in the chart below, the Defendants file thousands of income tax returns each year. They claim refunds on approximately 90% of all returns they file.

| Filing Year | Returns Prepared | Returns Claiming Refunds |
|---|---|---|
| 2016 | 1,924 | 1,848 (96%) |
| 2017 | 2,198 | 2,053 (93%) |
| 2018 | 2,442 | 2,270 (92%) |
| 2019 | 1,891 | 1,738 (91%) |
| 2020 | 1,784 | 1,638 (91%) |
| 2021 | 1,730 | 1,578 (91%) |
| 2022 | 1,467 | 1,289 (90%) |
| 2023 | 1,297 | 1,151 (89%) |
| Total | 14,730 | 13,565 (92%) |

*Improperly using PTINs*

52. As noted earlier, anyone who prepares or assists in preparing federal tax returns for compensation is required to have a valid PTIN assigned by the IRS

and is  required to identify themselves as the preparer on all federal tax returns that they prepare for compensation by signing their name and reporting their PTIN on each return.  *See* 26 U.S.C. § 6109.

52. Madison obtained a PTIN from the IRS (ending in 5995) that he uses to identify himself on tax returns he prepares for customers.

53. Madison's PTIN expired on December 31, 2022 and he did not renew it until January 23, 2024.

54. For over a year, Madison prepared returns with an expired PTIN.

55. The Defendants have also prepared customer tax returns that misidentify or fail to identify the name of the tax return preparer who actually completed that customer's return.

56. For example, Customers 15 and 16 reported to the IRS that they spoke with Darryl Madison to complete their tax return, but Yvette Madison signed the filed return.

57. As evidenced above, the Complaint refers to the Defendants' customers by a number.  A Customer Key, which identifies each customer by name and SSN, will be served on the Defendants with this complaint.

*Using an incorrect EIN*

58. In addition to listing an employee's PTIN on any tax return they prepare, tax preparation firms must list their EIN on any tax returns prepared by the business and filed with the IRS.

59. The Defendants file customers' tax returns that often improperly use the EIN of

the political campaign rather than the EIN assigned to Madison Tax Services.

*Using another company's EFIN*

60. To electronically file customers' federal tax returns, the IRS requires all tax return preparers to also obtain an EFIN. Each EFIN is uniquely associated with a specific address (e.g., tax return preparation business/store address). An EFIN application includes the identification of the person responsible for all tax returns that originate from the address associated with the EFIN. An EFIN application includes the names of individuals who are authorized to act on behalf of the tax return preparation business in legal or tax matters.

61. Madison's application for an EFIN was rejected in 2016.

62. One of the reasons the IRS rejected Madison's application for an EFIN was his arrest and conviction for "Possession of a Forged Instrument, Fraud-Insufficient Funds Check, Forgery and Fraud."

63. Because Madison cannot obtain an EFIN, the Defendants file federal tax returns for their paying customers using the EFIN associated with KA USA Investment & Development, doing business as Madison Tax Services ("KA USA").

64. KA USA's EFIN application was filed by Sylvester Lloyd, who does not live in Florida and was identified as the paid tax return preparer on only two of Madison Tax Service's returns in 2023.

65. Madison's wife operates KA USA.

66. Madison is listed as the primary contact on KA USA's EFIN application.

67. Madison has sole responsibility for the EFIN used by the Defendants at Madison Tax Services.

## Defendants' Schemes

68. Despite charging their customers hundreds of dollars for their services, the Defendants prepare returns that claim fraudulent deductions and credits to purposely underreport the tax their customers owe and claim refunds they are not entitled to receive.

69. The Defendants engage in unlawful tax return preparation practices, as described below.

### *False and Inflated Schedule A Deductions*

70. The Defendants often understate their customer's tax liabilities by overstating or fabricating deductions claimed on Form Schedule A "Itemized Deductions," submitted to the IRS as an attachment to the customer's Form 1040 federal individual income tax return.

71. Form Schedule A is used to claim itemized deductions for charitable giving, professional fees and expenses, healthcare costs, and other unreimbursed expenses.

72. Claiming false or inflated deductions allows a fraudulent tax return preparer to underreport the customer's taxable income and reduce the tax liability reported on the customer's tax return.  In many cases, the reduction in reported tax leads to fraudulent refund claims.

73. For some of their customers, the Defendants knowingly prepare false returns with Schedule A deductions that the customers are not eligible for.

74. One of the ways that the Defendants understate their customers' tax liabilities on Forms Schedule A is by falsely overstating the amount of local real estate taxes reportedly paid.

75. The Defendants also falsely increase the amounts of home mortgage interest and mortgage insurance premium deductions reported.

76. And in some cases, the Defendants inflate charitable contributions.

77. The Defendants use the Schedule A scheme to improperly reduce their customers' liabilities and/or inflate the tax refund they claim for their customers.

78. For tax years 2019 through 2022, the Defendants claimed thousands of dollars in false or inflated Schedule A deductions for their customers, resulting in significant tax harm.

*False and Inflated Schedule C Deductions*

79. The Defendants understate their customers' adjusted gross income ("AGI") by fabricating or inflating losses claimed on Forms Schedule C, "Profit or Loss from Business (Sole Proprietorship)," filed with their customers' federal income tax returns.

80. An individual who earns income from a sole-proprietorship reports that income and any expenses of the sole proprietorship on a Form Schedule C. Form Schedule C is submitted to the IRS as an attachment to the individual's federal

14

individual income tax return, Form 1040. The overall income (or loss) from Schedule C is reported as a line item on the individual's Form 1040 and is a component of the taxpayer's AGI.

81. For some customers, the Defendants knowingly prepare false returns with Schedule C income and expenses for entirely fictitious sole proprietorships.

82. The Defendants also knowingly prepare false returns with inflated Schedule C income and expenses.

83. The fictitious or false Schedule C losses improperly reduce customers' taxable income, often by offsetting other income, such as income reported on a Form W-2.

84. In addition to reducing taxable income, the Schedule C scheme often results in customers receiving a greater Earned Income Tax Credit ("EITC") than they are entitled to obtain.

85. The EITC is a refundable tax credit available to certain working taxpayers with low to moderate income.  The amount of the credit is based on the taxpayer's income, filing status, and claimed number of dependents. Because the EITC is a refundable credit, claiming an EITC can, in certain circumstances, reduce a taxpayer's federal tax liability below zero, entitling the taxpayer to a payment from the U.S. Treasury.

86. Due to the method used to calculate the EITC, for certain income ranges, individuals with higher earned income are entitled to a larger credit than those with lower income. The amount of the credit increases as income increases

between $1 and a set income amount and decreases as income increases beyond another higher set income amount. For example, in tax year 2022, the maximum EITC was $6,935 and was available to eligible individuals with three dependent children who earned income between $15,400 and $20,150.  Some tax preparers who manipulate reported income to maximize the EITC refer to this range of earned income corresponding to a maximum EITC as the "sweet spot" or "golden range."

87. Because of the way the EITC is calculated, reporting more income, up to a certain point, allows customers to receive a larger refundable credit. Similarly, claiming losses to offset higher income to decrease the total reported income and to fall within the "sweet spot" allows customers to claim a larger refundable credit.

88. Through the Schedule C scheme, the Defendants lower customers' earned income, which results in increased EITCs for some customers and in other cases, results in customers receiving EITC despite being otherwise ineligible.

89. These bogus reductions in reported tax also leads to the Defendants claiming increased refund amounts on customers' tax returns.

90. For tax years 2019 through 2022, the Defendants claimed thousands of dollars in false or inflated Schedule C losses on their customers' returns, resulting significant tax harm .

### *Fabricated Residential Energy Credits*

91. The Defendants use the Residential Energy Credit to improperly reduce some

of their customers' liabilities and/or inflate the tax refund for which their customers are eligible to receive.

92. The Internal Revenue Code provides a non-refundable tax credit to taxpayers who make certain energy efficient improvements to their home. This credit is reported on a Form 5695, "Residential Energy Credits," attached to a taxpayer's Form 1040 federal individual income tax return.

93. A taxpayer can receive the Residential Energy Credit by purchasing certain clean energy property, such as solar equipment, wind turbines, and geothermal heat pumps. If a taxpayer makes such a purchase, they can reduce their taxable income by a percentage of the equipment costs.

94. For some customers, the Defendants listed fictitious or false Residential Energy Credits.

95. Those credits improperly reduced the customer's taxable income, often by offsetting other income, such as income reported on a Form W-2.

96. For tax years 2019 through 2022, the Defendants claimed thousands of dollars in entirely false or improperly inflated Residential Energy Credits for their customers, resulting in significant tax harm.

### *Other Fraudulent Schemes*

97. The Defendants use deductions, like the Health Saving Account ("HSA"), to improperly reduce some of their customers' liabilities and/or inflate the tax refund for which the Defendants claim for their customers.

98. Taxpayers may claim a tax deduction for contributions they make to an HSA.

17

The amount of the deduction generally is the amount a taxpayer contributes to the HSA, subject to a cap.

99. To be eligible to make contributions to an HSA, a taxpayer must be covered under a high deductible health plan ("HDHP"). An HDHP is a specific health insurance plan that has a higher annual deductible than typical health plans.

100. Eligible taxpayers can claim a deduction for contributions to an HSA on IRS Form 8889, "Health Savings Accounts," attached to a taxpayer's Form 1040, federal individual income tax return.

101. The Defendants prepare tax returns claiming HSA deductions at a higher rate than state and national averages.

102. In 2021, 1.07% of returns in Florida and 1.22% of returns nationwide claimed HSA deductions.

103. The Defendants claimed HSA deductions on approximately 2.8% of the returns they prepared in 2021.

104. The Defendants attribute fictitious income to customers on their federal income tax returns to increase their claimed earned income through Household Help Income ("HSH").

105. HSH is paid to individuals typically hired to perform household work. These individuals are considered employees of the person for whom they perform the household work. The individual receiving the income may be paid in cash or non-cash benefits, on an hourly, weekly, or monthly basis, for jobs such as babysitting, house cleaning, yard work, health care, or driving.

106. By adding false HSH income to customer returns, the Defendants increase income and then claim false EITC on customers' tax returns.

107. The Defendants prepare tax returns claiming HSH deductions at an abnormally high rate compared to state and national averages.

108. In 2022, 0.5% of returns in Florida and 0.2% of returns nationwide claimed HSH deductions.

109. However, the Defendants claimed HSH deductions on approximately 7.9% of the returns they prepared for their customers in 2022.

### IRS Investigation into the Defendants' Practices

110. The IRS interviewed  Madison, Eugene, Yvette Madison and Brown and 68 of their customers to determine the accuracy of the items reported on the customer's filed returns.

111. For the 2020 tax year, the IRS determined a random sample of the Defendants' customers, sent those customers contact letters, and ultimately interviewed 28 customers.

112. The results of those interviews showed that 24 out of the 28 tax returns the Defendants prepared underreported tax. All 14 of the returns with Forms Schedule A were false and then adjusted.  Fifteen out of the 18 returns with Forms Schedule C were false and then adjusted.

113. The Defendants had an 85.71% error rate for the tax year 2020 returns they prepared.  On average, each return the Defendants prepared for tax year 2020 resulted in a loss to the United States of $5,923.73.

114. For the 2021 tax year, the IRS determined a random sample of the Defendants' customers, sent those customers contact letters, and ultimately interviewed 19 customers.

115. The results of those interviews showed that 14 of the 19 tax returns the Defendants prepared underreported tax.

116. The Defendants had a 73.68% error rate for the tax year 2021 returns they prepared. On average, each return the Defendants prepared for tax year 2021 resulted in a loss to the United States of $2,651.91.

117. For the 2022 tax year, the IRS determined a random sample of the Defendants' customers, sent those customers contact letters, and ultimately interviewed 21 customers.

118. The results of those interviews showed that the tax returns of 18 of those 21 customers underreported tax.

119. The Defendants had a 91.67% error rate for the tax year 2022 returns they prepared. On average, each return the Defendants prepared for tax year 2022 resulted in a loss to the United States of $4,256.00.

120. Representative examples of the Defendants' schemes are described below. To protect the privacy of the customers referenced in this complaint, the United States has identified them as "Customer X."

### Darryl J. Madison

*Customers 1 and 2*

121. Madison prepared the 2020 joint federal income tax return for Customers 1

and 2, including Forms Schedule A and C. Madison Tax Services is the preparation firm identified on the return.

122. Customers 1 and 2 paid Madison between $550-$650 for tax preparation services. That fee was subtracted from their refund.

123. Customers 1 and 2 provided Madison with the IRS Form 1098 showing they paid $6,274 in mortgage interest for 2020, told Madison that they paid slightly over $2,000 in real estate taxes, and did not discuss or provide anything to Madison about making charitable contributions.

124. However, Madison falsely claimed a $12,548 deduction for mortgage interest, $7,253 deduction for property taxes, and $16,620 deduction for charitable contributions on Customers 1 and 2's 2020 Form Schedule A.

125. Customers 1 and 2 did not incur the expenses reported on their Form Schedule A and did not tell Madison they did.

126. Madison also falsely reported gross income and expenses on Customers 1 and 2's 2020 Form Schedule C, for a reported net loss of $15,695.

127. Customers 1 and 2 did not incur the expenses and losses reported on their Form Schedule C and did not tell Madison they did.

128. As a result of Madison's fabrications, Customers 1 and 2 received a $5,224 refund to which they were not entitled.

*Customer 3*

129. Madison prepared the 2020 federal income tax return for Customer 3, including Forms Schedules A and C. Madison Tax Services is the preparation

firm identified on the return.

130. Customer 3 paid Madison between $500-$700 for tax preparation services. That fee was subtracted from his refund.

131. Customer 3 provided Madison with his Form W-2, a Form 1098 listing mortgage interest paid of $5,720, and real estate tax information showing real estate taxes in the amount of $5,625. Customer 3 told Madison he made $1,000 for charitable contributions.

132. However, Madison falsely claimed Customer 3 paid $6,700 in mortgage interest, $14,768 in real estate taxes, and $7,362 for charitable contributions on Customer 3's 2020 Form Schedule A.

133. Customer 3 provided records identifying $3,000 in expenses incurred for his side business.

134. But Madison falsely reported $7,954 in expenses for the side business on Customer 3's 2020 Form Schedule C.

135. Customer 3 did not incur the expenses and losses reported on the Forms Schedule A and C and did not tell Madison he did.

136. Madison listed a $2,819 Residential Energy Credit, falsely claiming Customer 3 purchased $10,844 of qualifying solar water heating equipment.

137. Customer 3 did not purchase such equipment and did not discuss the Residential Energy Credit with Madison.

138. As a result of Madison's fabrications, Customer 3 received a $10,054 refund to which he was not entitled.

*Customer 4*

139. Madison prepared the 2020 federal income tax return for Customer 4, including Forms Schedules A and C. Madison Tax Services is the preparation firm identified on the return.

140. Customer 4 paid Madison between $400-500 for tax preparation services. That fee was subtracted from his refund.

141. Customer 4 told Madison he donated about $500 per month to his church.

142. However, Madison falsely claimed a deduction for $11,700 for charitable contributions on Customer 4's 2020 Form Schedule A, nearly double the amount Customer 4 told Madison.

143. Madison also included on Customer 4's 2020 tax return bogus line items for significant expenses, gross receipts, and costs of goods sold reported on a Form Schedule C.

144. Customer 4 did not own a sole proprietorship that would necessitate a Form Schedule C filing.

145. Customer 4 did not review his tax return with Madison and did not receive a copy of the final completed return.

146. As a result of Madison's fabrications, Customer 4 received a $707 refund to which he was not entitled.

*Customers 5 & 6*

147. Madison prepared the 2020 joint federal income tax return for Customers 5 and 6, including Form Schedule A. Madison Tax Services is the preparation

firm identified on the return.

148. Customers 5 and 6 paid Madison around $629.90 for tax preparation services. That fee was subtracted from their refund.

149. Customers 5 and 6 provided Madison with real estate tax information showing real estate taxes in the amount of $4,174, and a Form 1098 listing mortgage insurance of $9,581.

150. However, Madison falsely claimed deductions of $12,279 in property taxes and $22,672 in mortgage interest and insurance on Customer 5 and 6's 2020 Schedule A, or approximately triple the amount of the real estate taxes and mortgage insurance premium they actually paid.

151. Madison falsely claimed a $7,000 HSA deduction and a $7,000 IRA deduction on the Schedule 1 attached to the return.

152. Customers 5 and 6 did not have an HSA or IRA and did not discuss either with Madison.

153. Madison attached a Schedule 3, falsely listing $2,079 of Net Premium Tax credit and Qualified Sick and Family Leave Credits to Customers 5 and 6's 2020 tax return.

154. But Customers 5 and 6 did not provide or discuss anything with Madison about the credits.

155. As a result of Madison's fabrications, Customers 5 and 6 received a $222 refund to which they were not entitled.

24

*Customer 7*

156. Madison prepared the 2021 and 2022 federal income tax returns for Customer 7, including Forms Schedule A and C. Madison Tax Services is the preparation firm identified on the returns.

157. Customer 7 provided Madison with Forms W-2, bank and credit card statements, and QuickBooks for his business. Customer 7 discussed giving $1,000 to sponsor a child in Nicaragua in 2022.

158. However, Customer 7's Forms Schedule A falsely claimed deductions of $16,454 and $17,754 for charitable contributions for 2022 and 2021, respectively.

159. Customer 7 did not make charitable contributions in the amounts reported by Madison on the tax returns.

160. Madison reported $19,554 of costs of goods sold, as well as numerous other expenses on Customer 7's Form Schedule C for tax year 2022.

161. But Customer 7 did not incur any costs of goods sold and did not tell Madison he incurred the other expenses reported on his 2022 Form Schedule C.

162. Madison falsely claimed $19,284 in car and truck expenses on Customer 7's Form Schedule C for tax year 2021.

163. Customer 7 did not recognize the car and truck expenses reported on his 2021 Form Schedule C and did not tell Madison he incurred it.

164. As a result of Madison's fabrications, Customer 7 received a $15,637 refund in 2022 and a $20,472 refund in 2021 to which he was not entitled.

**Malik F. Eugene**

*Customers 8 & 9*

165. Eugene prepared the 2020 joint federal income tax return for Customers 8 and 9, including Form Schedule A. Madison Tax Services is the preparation firm identified on the return.

166. Customers 8 and 9 paid Eugene around $570 for tax preparation services. That fee was subtracted from their refund.

167. Customers 8 and 9 told Eugene they paid $1,415 in property taxes and provided their Forms W-2, 1099R, 1095C, and 1098, listing $2,877 in mortgage interest. They did not discuss with Eugene making any charitable contributions in 2020.

168. However, Eugene falsely claimed Customers 8 and 9 paid $2,830 in real estate taxes, $5,754 in mortgage interest, and $13,194 for charitable contributions on Customer 8 and 9's 2020 Form Schedule A.

169. Eugene claimed a bogus $4,550 Residential Energy Credit on Customer 8 and 9's 2020 tax return, falsely claiming that Customer 8 and 9 purchased $17,500 of qualified solar electric property.

170. Customers 8 and 9 did not purchase such equipment and did not discuss the Residential Energy Credit with Eugene.

171. As a result of Eugene's fabrications, Customers 8 and 9 received a $5,623 refund to which they were not entitled.

*Customers 10 and 11*

172. Customers 10 and 11 spoke with Darryl Madison to prepare their 2021 joint return, including Forms Schedule A and C, and a receptionist entered the information into the computer. Eugene signed Customer 10 and 11's 2021 federal income tax return. Madison Tax Services is the preparation firm identified on the return.

173. Customers 10 and 11 paid Eugene $620 for tax preparation services. That fee was subtracted from their refund.

174. Customers 10 and 11 provided their Forms W-2 and 1098. Customer 10 also provided information about a consulting side business.

175. Customers 10 and 11 did not discuss any medical expenses or charitable contributions with Eugene or Madison Tax Services.

176. However, Eugene falsely claimed deductions of $15,656 in medical expenses and $16,590 for charitable contributions on their Form Schedule A. Customers 10 and 11 did not incur those costs.

177. Eugene falsely reported $6,652 in cost of goods sold, $1,847 in meals, and $3,450 in other expenses on a Form Schedule C for Customer 10.

178. Customer 10 did not incur those expenses and did not discuss them with Eugene.

179. As a result of Eugene's fabrications, Customers 10 and 11 received a $4,460 refund to which they were not entitled.

27

*Customers 12 and 13, Eugene & Brown*

180. Two of the Defendants prepared the joint federal income tax returns for Customers 12 and 13. Madison Tax Services is the preparation firm identified on both returns.

181. Eugene prepared Customer 12 and 13's 2022 joint federal income tax return.

182. Brown prepared Customer 12 and 13's 2021 joint federal income tax return.

183. Customers 12 and 13 paid $574.90 for tax preparation services in 2022 and $629.90 in 2021.  Those fees were subtracted from their refunds.

184. Customers 12 and 13 completed an intake sheet, provided their Forms W-2 and 1098, a daycare expense statement, and told Eugene they made $300 of annual contributions to charity in 2022.

185. However, Eugene and Brown falsely claimed significantly higher deduction amounts on Customers 12 and 13's 2022 Form Schedule A, including $7,900 for charitable contributions in 2022 and $9,074 for charitable contributions in 2021.

186. As a result of Eugene and Brown's fabrications, Customers 12 and 13 received a $5,074 refund in 2022 and $6,199 refund in 2021 to which they were not entitled.

**Yvette Madison**

*Customer 14*

187. Yvette Madison prepared the 2020 federal income tax returns for Customer 14, including Form Schedule C. Madison Tax Services is the preparation firm

28

identified on the returns.

188. Customer 14 provided his Forms W-2 and told Yvette Madison his expenses for his side business ranged between $200-$300 per year.

189. However, Yvette Madison falsely claimed $17,251 in business expenses on Customer 14's Forms Schedule C for 2020.

190. As a result of Yvette Madison's fabrications, Customer 14 received a $6,086 refund in 2020 to which he was not entitled.

*Customers 15 and 16*

191. Yvette Madison is identified as the tax return preparer for Customer 15 and 16's 2022 and 2021 joint federal income tax returns, including Forms Schedule A. Madison Tax Services is the preparation firm identified on the returns.

192. However, Customers 15 and 16 only spoke with Darryl Madison.

193. Customers 15 and 16 paid Madison $456 for 2022 tax preparation services. That fee was subtracted from their refund.

194. For 2022, Customers 15 and 16 provided Form W-2 statements, records of real estate tax payments, mortgage interest statements showing $6,824, charitable contribution receipts for $845, and documents for a dependent.

195. However, Yvette Madison falsely claimed deductions of $13,648 in mortgage interest and $13,136 for charitable contributions on Customer 15 and 16's 2022 Form Schedule A.

196. When they reviewed their return with Darryl Madison, Customers 15 and 16 told him the charitable contribution was incorrect, but Darryl Madison did not

29

correct the tax return.

197. A Form Schedule C was attached to Customer 15 and 16's 2022 and 2021 federal income tax return.

198. Customers 15 and 16 did not own a sole proprietorship that would necessitate them filing a Form Schedule C.

199. Yvette Madison claimed a bogus Residential Energy Credit on Customer 15 and 16's 2021 and 2022 return as a credit carryforward from 2020.

200. Customers 15 and 16 never documented any solar property costs, do not have solar energy in their home, and did not discuss the Residential Energy Credit with Madison.

201. As a result of Yvette Madison's fabrications, Customers 15 and 16 received a $4,481 refund in 2022 and a $4,659 refund in 2021 to which they were not entitled.

*Customers 17 and 18*

202. Yvette Madison prepared Customer 17 and 18's 2022 and 2021 joint federal income tax returns, including Form Schedule C. Madison Tax Services is the preparation firm identified on the returns.

203. Customers 17 and 18 do not know the amount paid in tax preparation fees but it was subtracted from their tax refund.

204. Customers 17 and 18 provided Yvette Madison Forms W-2 for each year.

205. Customer 17 and 18's federal income tax return for 2022 and 2021 included IRS Forms 8812, Credits for Qualifying Children and Other Dependents.

30

206. Customers 17 and 18 did not provide dependent documents and did not tell Yvette Madison they had a dependent, as for the years their daughter was over 21 and worked.

207. Moreover, Yvette Madison attached a Form Schedule C to Customer 17 and 18's 2022 and 2021 federal income tax returns, showing thousands of dollars in expenses that they did not incur. Customer 17 was on Navy reserve duty abroad for 2021 and did not have a separate business in either 2021 or 2022.

208. Customers 17 and 18 did not discuss owning a business with Yvette Madison.

209. As a result of Yvette Madison's fabrications, Customers 17 and 18 and received refunds of $2,705 for 2022 and $5,167 for 2021 to which they were not entitled.

**Marlesa Brown**

*Customers 19 and 20*

210. Brown prepared the 2020 joint federal income tax return for Customers 19 and 20, including Forms Schedules A and C. Madison Tax Services is the preparation firm identified on the return.

211. Customers 19 and 20 paid Brown between $400-500 for tax preparation services. That fee was subtracted from their refund.

212. Customers 19 and 20 provided Brown with a Form 1098 listing mortgage interest of $9,892 and insurance premium of $1,833. They discussed paying real property taxes and making $3,000 for charitable contributions.

213. However, Brown falsely claimed deductions of $19,784 of mortgage interest, $3,668 of insurance premium, $6,238 of real property taxes, and $20,500 for

charitable contributions on Customers 19 and 20's 2020 Form Schedule A.

214. Customer 19 and 20's 2020 tax return falsely claimed $12,310 in business expenses on a Form Schedule C.

215. Customers 19 and 20 discussed owning a business with Brown, but told Brown that their expenses were, at most, $3,000 for the year.

216. As a result of Brown's fabrications, Customers 19 and 20 received a $4,858 refund to which they were not entitled.

*Customers 21 and 22*

217. Brown prepared Customer 21 and 22's 2021 joint federal income tax return. Madison Tax Services is the preparation firm identified on the return.

218. Customers 21 and 22 stated they paid Brown $350 for tax preparation services. That fee was subtracted from their refund.

219. Customers 21 and 22 provided their Forms W-2, army retirement income, mortgage interest statement showing $9,691, and donation receipt. They also completed an information sheet.

220. However, Brown falsely claimed deductions of $19,382 in mortgage interest and $2,966 in "other taxes" on the Schedule A attached to Customer 21 and 22's 2021 federal income tax return.

221. Customers 21 and 22 did not pay "other taxes" and did not discuss those costs with Brown.

222. As a result of Brown's fabrications, Customers 21 and 22 received a $477 refund to which they were not entitled.

32

*Customers 23 and 24*

223. Brown prepared Customers 23 and 24's 2022 and 2021 joint federal income tax returns. Madison Tax Services is the preparation firm identified on the returns.

224. Customers 23 and 24 did not know their preparation fee was subtracted from their refunds but stated that in 2022 they received a refund of around $4,000 and not the $5,229 refund listed on their return.

225. For tax year 2022, Customers 23 and 24 provided their retirement, social security income, grandchild residency and school documents to Brown by email. They did not receive or report any Form W-2 for 2022 or 2021.

226. Brown falsely reported household employee income on the 2022 and 2021 tax returns, falsely reporting that Customer 23 was employed as a babysitter.

227. Customers 23 and 24 were not aware that household employee wages were reported on their returns, did not work in any capacity or earn those reported HSH wages, and did not discuss any household wages with Brown.

228. As a result of Brown's fabrications, Customers 23 and 24 received a $5,118 refund for 2021, and a $5,229 refund for 2022 to which they were not entitled.

### Harm Caused by the Defendants

229. Through the schemes and other conduct described above, the Defendants engage in a pattern of falsely or fraudulently understating their customers' taxes and overstating their refunds or credits, which results in the loss of federal tax revenue.

230. In many instances, the Defendants' false or fraudulent understatement of their customers' taxable income and overstatement of their customers' refunds and credits cause the United States to issue refunds that the customers are not entitled to receive.

231. In addition to the lost tax revenue, the United States must bear the substantial cost of examining tax returns the Defendants prepare and collecting the understated liabilities from their customers.

232. As a result of its investigation in the Defendants' schemes, the IRS estimates the Defendants caused a minimum of $8,032,586 in tax harm from tax years 2019 through 2022.

233. The Defendants' illegal conduct harms honest tax return preparers because, by preparing tax returns that unlawfully inflate their customers' refunds, the Defendants gain a competitive advantage over tax return preparers who prepare returns in accordance with the law. Customers who are satisfied with the tax refunds they receive, and generally unaware of the Defendants' illegal return preparation practices, return to the Defendants for subsequent tax seasons.

234. The Defendants' actions undermine confidence in the federal income tax system. The Defendants' customers trust—and pay—them to prepare honest tax returns. The Defendants betray that trust and harm their customers, who could potentially be required to pay tax deficiencies, interest, and penalties resulting from the Defendants' conduct.

34

235. The Defendants encourage noncompliance with the internal revenue laws by failing to confirm with customers that their tax returns honestly and accurately reflect the information the customers provided.

236. The Defendants' actions also harm their customers because they paid the Defendants fees to prepare proper tax returns, but instead the Defendants' prepared false and fraudulent returns that potentially expose the customers to IRS audits, statutory penalties, and repayment of erroneous refunds.

### COUNT I: Injunction under 26 U.S.C. § 7407

237. The United States realleges paragraphs 1 through 236.

238. Section 7407 of the Internal Revenue Code authorizes a district court to enjoin a person who is a tax return preparer from engaging in certain conduct or from further acting as a tax return preparer. The prohibited conduct justifying an injunction includes

   a. Engaging in conduct subject to penalty under 26 U.S.C. § 6694(a), which penalizes a tax return preparer who prepares a return that contains an understatement of tax liability or an overstatement of a refund or credit due to an unreasonable position that the tax return preparer knew or should have known was unreasonable;

   b. Engaging in conduct subject to penalty under 26 U.S.C. § 6694(b), which penalizes a tax return preparer who prepares a return that contains an understatement of tax liability or an overstatement of a refund due to willful or reckless conduct;

c. Engaging in conduct subject to penalty under 26 U.S.C. §§ 6695(b) and 6695(c), which penalize a tax return preparer who fails to properly sign and identify himself or herself as the paid tax return preparer;

d. Engaging in conduct subject to penalty under 26 U.S.C. § 6695(g), which penalizes a tax return preparer who does not exercise due diligence in determining eligibility for earned income tax credits; and

e. Engaging in any other fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws.

239. To issue an injunction, the court must find (1) that the tax return preparer engaged in the prohibited conduct and (2) that injunctive relief is appropriate to prevent the recurrence of the conduct.

a. If a tax return preparer's conduct is continual or repeated and the court finds that a narrower injunction would not be sufficient to prevent the tax return preparer's interference with the proper administration of the internal revenue laws, the court may permanently enjoin the person from acting as a tax return preparer. *See* 26 U.S.C. § 7407(b).

b. The Defendants continually and repeatedly engage in conduct subject to penalty under 26 U.S.C. § 6694 by preparing tax returns that understate their customers' tax liabilities and overstate their refunds and credits. As described above, the Defendants prepare returns that claim deductions for expenses not incurred by their customers and credits to which the taxpayers are not entitled. The Defendants do so with the knowledge that

36

the positions they take on tax returns are unreasonable and lack substantial authority. The Defendants thus engage in conduct subject to penalty under 26 U.S.C. § 6694(a).

c. The Defendants engage in conduct subject to penalty under 26 U.S.C. § 6694(b) by willfully understating customers' liabilities and acting with a reckless and intentional disregard of rules and regulations.

d. Additionally, the Defendants engage in conduct subject to penalty under 26 U.S.C. §§ 6695(b) and 6695(c) for failure to properly sign and identify himself or herself as the paid tax return preparer.

e. The Defendants also engage in conduct subject to penalty under 26 U.S.C. § 6695(g), which penalizes a tax return preparer who does not exercise due diligence in determining eligibility for earned income tax credits.

f. The Defendants' conduct substantially interferes with the administration of the internal revenue laws. Injunctive relief is necessary to prevent this misconduct because, absent an injunction, the Defendants are likely to continue preparing false federal income tax returns.

g. Indeed, the IRS has assessed multiple penalties against Madison for his understatement of his customers' liabilities. The warnings and penalties had no effect on Madison's practices.

h. A narrower injunction would be insufficient to prevent the Defendants' interference with the administration of the internal revenue laws. The

37

Defendants prepare tax returns understating their customers' liabilities through multiple schemes that report false information on their customers' tax returns. In addition, the IRS may not yet have identified all of the schemes used by the defendants to understate liabilities and to overstate refunds and credits. Without a permanent injunction against the Defendants, the IRS will be required to spend additional resources to uncover all of their future schemes. The harm resulting from these schemes includes both the expenditure of these resources and the revenue loss caused by the improper deductions and credits the Defendants claim on the tax returns they prepare. Accordingly, only a permanent injunction is sufficient to prevent future harm caused by the Defendants acting as tax return preparers.

## COUNT II: Injunction under 26 U.S.C. § 7408

240. The United States realleges paragraphs 1 through 236.

241. Section 7408 of the Internal Revenue Code authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6701.

242. Section 6701 of the Internal Revenue Code penalizes a person who aids or assists in the preparation of tax returns that the person knows will result in an understatement of tax liability.

243. The Defendants engage in conduct subject to penalty under 26 U.S.C. § 6701 by knowingly and willfully preparing, aiding, or assisting in the preparation of income tax returns that claim credits and deductions that they know to be

improper, false, or inflated.

244. If the Court does not enjoin the Defendants, they are likely to continue engaging in conduct subject to penalty under 26 U.S.C. § 6701. The Defendants' preparation and filing of tax returns claiming improper credits and deductions is widespread over many customers and many tax years. Injunctive relief is appropriate under 26 U.S.C. § 7408 to prevent recurrence of this conduct.

### COUNT III: Injunction under 26 U.S.C. § 7402

245. The United States realleges paragraphs 1 through 236.

246. Section 7402(a) of the Internal Revenue Code authorizes a court to issue orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws.

247. The Defendants repeatedly and continually engage in conduct that interferes substantially with the administration and enforcement of the internal revenue laws.

248. If the Defendants continue to act as tax return preparers, their conduct will result in irreparable harm to the United States, and the United States has no adequate remedy at law.

249. The Defendants' conduct has caused, and will continue to cause, substantial tax losses to the United States Treasury, much of which may be undiscovered and unrecoverable. The IRS will have to devote substantial and unrecoverable time and resources auditing customers individually to detect understated liabilities and overstated refund claims unless the Court enjoins the Defendants'

activities.

250. The detection and audit of erroneous tax credits and deductions claimed on tax returns prepared by the Defendants would be a significant burden on IRS resources.

251. Injunctive relief is appropriate because any harm to the Defendants caused by an injunction preventing them from continuing their illegal schemes is substantially outweighed by the harm they cause to the United States and to the public.

### Count IV: Disgorgement under 26 U.S.C. § 7402(a)

252. The United States realleges paragraphs 1 through 236.

253. Section 7402 of the Internal Revenue Code authorizes a district court to issue orders, judgments, and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws.

254. The Defendants' conduct substantially interferes with the enforcement of the internal revenue laws and has caused the United States to issue falsely or fraudulently inflated tax refunds to individuals not entitled to receive them. The Defendants have unjustly profited at the expense of the United States by subtracting their tax preparation fees from those bogus refunds.

255. The Defendants are not entitled to these ill-gotten gains.

256. But for the Defendants' conduct, these bogus refunds would not have been issued.

40

257. Using its broad authority under 26 U.S.C. § 7402(a), the Court should enter an order requiring the defendants to disgorge to the United States the receipts (in the form of fees earned by engaging in false or fraudulent conduct) for preparing federal tax returns that make false or fraudulent claims.

### RELIEF REQUESTED

258. The United States respectfully requests that the Court:

    a. Find that the Defendants repeatedly and continually engaged in conduct subject to penalty under 26 U.S.C. §§ 6694 and 6695, injunctive relief is appropriate under 26 U.S.C. § 7407 to prevent recurrence of that conduct, and a narrower injunction would not be sufficient to prevent the recurrence of the Defendants' conduct;

    b. Find that the Defendants repeatedly and continually engaged in conduct subject to penalty under 26 U.S.C. § 6701 and that injunctive relief is appropriate under 26 U.S.C. § 7408 to prevent recurrence of that conduct;

    c. Find that the Defendants repeatedly and continually engaged in conduct that substantially interferes with the proper enforcement and administration of the internal revenue laws and that injunctive relief is appropriate under 26 U.S.C. § 7402(a) and this Court's equitable authority to prevent recurrence of that conduct;

    d. Enter a permanent injunction prohibiting the Defendants, and any other person or entity working in concert or participation with them, from directly or indirectly:

41

i. Preparing, assisting in the preparation of, or directing the preparation of federal tax returns, amended returns, or other tax-related documents and forms, including any electronically submitted tax returns or tax-related documents, for any entity or person other than themselves;

ii. Filing, assisting in the filing of, or directing the filing of federal tax returns, amended returns, or other tax-related documents or forms, including any electronically submitted tax returns or tax-related documents, for any entity or person other than themselves;

iii. Owning, operating, managing, controlling, working for, profiting from, or volunteering for any individual, business or entity that prepares or assists in the preparation of tax returns, amended returns, or other tax-related documents or forms, including any electronically submitted tax returns or tax-related documents;

iv. Using, maintaining, renewing, obtaining, transferring, selling, or assigning any Preparer Tax Identification Number ("PTIN") and Electronic Filing Identification Number ("EFIN");

v. Using a PTIN, EFIN, Employer Identification Number ("EIN"), Taxpayer Identification Number ("TIN"), Social Security Number ("SSN") or any other federally issued identification number that belongs to another to file or remit federal tax returns;

vi. Allowing others to use an EFIN, EIN, TIN, PTIN, or any other federally issued identification number to prepare or file federal income tax returns;

vii. Assisting in, or financially benefitting from, the preparation of federal tax returns;

viii. Engaging in activity subject to penalty under 26 U.S.C. §§ 6694, 6695, or 6701; and

ix. Engaging in conduct that substantially interferes with the proper administration and enforcement of tax laws;

e. Require the Defendants, at their own expense, to:

i. Send by certified mail, return receipt requested, a copy of the final injunction entered against the Defendants in this action, as well as a copy of the Complaint setting forth the allegations as to how the Defendants fraudulently prepared federal tax returns, to each person for whom the Defendants prepared federal tax returns or any other federal tax forms after January 1, 2021, within 30 days of entry of the final injunction in this action;

ii. Provide the United States a list of the names, Social Security numbers, addresses, phone numbers, and email addresses of each person for whom the Defendants prepared tax returns, other tax forms, or claims for refund after January 1, 2021, within 30 days of entry of the final injunction in this action;

iii. Prominently post, within 10 days of entry of the final injunction in this action, in the Defendants' place of business where they prepare tax returns: a statement that they have been enjoined from the preparation of tax returns;

iv. Post for two years, on all social media accounts and websites the Defendants used to advertise their tax preparation services: a statement that they have been enjoined from the preparation of tax returns, a copy of the injunction, and a hyperlink to any press release regarding the injunction that the Department of Justice may issue;

v. Deliver a copy of the injunction to any employees, contractors and vendors of the Defendants, if any, within 30 days of entry of the final injunction in this action;

vi. File a sworn statement with the Court evidencing the Defendants' compliance with the directives in paragraphs 258 (e)(i)-(v) within 45 days of entry of the final injunction in this action; and

vii. Keep records of the Defendants' compliance with the directives in paragraphs 258 (e)(i)-(v), which may be produced to the Court, if requested, or the United States pursuant to paragraph f, below;

f. Enter an Order allowing the United States to monitor the Defendants' compliance with the injunction and to engage in post-judgment discovery in accordance with the Federal Rules of Civil Procedure;

g.  Order, without further proceedings, the immediate revocation of any and all PTINs and EFINs held by, assigned to, or used by the Defendants issued under 26 U.S.C. § 6109;

h.  After a period of discovery to determine an appropriate amount of disgorgement, order the Defendants to disgorge their ill-gotten gains to the United States;

i.  Retain jurisdiction over the Defendants and this action to enforce any permanent injunction entered; and

j.  Award the United States its costs incurred in connection with this action, along with such other relief as justice requires.

Date: January 15, 2025

DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division

*/s/Virginia Giannini*
VIRGINIA GIANNINI
DANIEL A. APPLEGATE
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238
Washington, D.C.  20044
202-307-6404 (v-Giannini)
202-353-8180 (v-Applegate)
202-514-6770 (f)
Virginia.Giannini2@usdoj.gov
Daniel.A.Applegate@usdoj.gov

*Of Counsel:*
ROGER B. HANDBERG
United States Attorney
Middle District of Florida

*For Plaintiff, United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to Local Rule 1.08(a), that this document is typed using 13-point

Calisto MT font and is double-spaced with one-inch margins.


<u>/s/ *Virginia Giannini*</u>
 VIRGINIA GIANNINI
 Trial Attorney
 U.S. Dept. of Justice, Tax Division