# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                Case No. 8:25-cv-116-KKM-SPF

DARRYL J. MADISON et al.,

     Defendants.

_____

## <u>ORDER</u>

The United States alleges that defendant tax preparers unlawfully claimed deductions and credits on behalf of their customers to maximize refunds and, in turn, defendants' fees. *See* Compl. (Doc. 1). Under the Internal Revenue Code (IRC), the government seeks an order permanently enjoining defendants from preparing tax returns for others (Counts I–III) and requiring defendants to disgorge ill-gotten gains received from preparing false tax returns (Count IV). *Id.* ¶¶ 1–2, 258. The defendants demand a jury trial on the disgorgement claim in Count IV, *see* Brown Ans. (Doc. 26); Madison Am. Ans. (Doc. 42), and the government moves to strike that demand, MTS Brown Jury Demand (Doc. 31); MTS Madison Jury Demand (Doc. 51). The government also moves to strike defendants Darryl Madison and Madison & Son Enterprises'

(d/b/a Madison Tax Services) "unclean hands" and "set off" affirmative defenses. MTS Aff. Defs. (Doc. 50). I grant the government's motions.

## I.   BACKGROUND

Defendant Darryl Madison owns and operates Madison Tax Services, a tax preparation services company located in Florida. Compl. ¶¶ 6, 16, 21. The government alleges that Madison and Madison Tax Services have prepared inaccurate and unlawful tax returns on behalf of paying customers for over ten years. *See, e.g. id.* at ¶¶ 23–27, 30, 54. For example, between 2013 and 2017, the Internal Revenue Service (IRS) sent Madison several letters notifying him of errors with returns he filed on behalf of his customers. *Id.* ¶ 23 The IRS also received customer "complaints alleg[ing] that Madison falsified claims on tax returns, understated customer taxable income, and failed to provide taxpayer[s] with support when taxpayers were audited by the IRS." *Id.* ¶¶ 24–25. Based on those complaints, the IRS assessed penalties against Madison for "willful or reckless conduct in preparing tax returns." *Id.* ¶ 26; *see* 26 U.S.C. § 6694(b). Madison never paid the penalties. *Id.* ¶ 27.

The government levels similar allegations against defendants Malik Eugene, Yvette Madison, and Marlesa Brown, each of whom worked as tax return preparers for Madison Tax Services. *See* Compl. ¶¶ 7–10, 37–51; *see* 26 U.S.C. § 7701(a)(36) (defining "[t]ax return preparer"). Looking to the returns filed under each defendant's unique Preparer Tax Identification Number

2

(PTIN) and by Madison Tax Services' Electronic Filing Identification Number (EFIN), the government alleges that the defendants prepared or filed "an unusually high number of returns claiming refunds." *Id.* ¶¶ 31, 36, 41, 46. More specifically, the government says the defendants overstated their customers' itemized deductions and reported "fictitious" business and energy expenses to minimize total taxable income. *Id.* ¶¶ 70–76, 79–82, 91–96. Ultimately, the government says that the defendants systematically "prepare false returns that claim tax refunds for customers who would otherwise not be entitled to them or inflate tax refunds for customers who would otherwise only be entitled to lower refunds," and then "deduct their return preparation fees directly from customers' refunds." *Id.* ¶¶ 49–50.

The defendants' actions have "result[ed] in the loss of federal tax revenue" as well increased costs to the government "of examining tax returns the Defendants prepare and collecting the understated liabilities from their customers." *Id.* ¶¶ 229–231. To address that alleged harm, the government seeks a permanent injunction prohibiting the defendants from preparing and filing others' tax returns under the IRC, 26 U.S.C. § 7407 (Count I), § 7408 (Count II), and § 7402 (Count III). Compl. ¶¶ 237–251. The government also requests "an order requiring the defendants to disgorge to the United States the receipts (in the form of fees earned by engaging in false or fraudulent

conduct) for preparing federal tax returns that make false or fraudulent claims" under 26 U.S.C. § 7402(a) (Count IV). *Id.* ¶¶ 254–257.

Answering separately, defendants Brown, Eugene, and Yvette Madison demand a trial by jury as to the claim for disgorgement in Count IV, contending that under *Securities and Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024), "a claim for disgorgement is . . . analogous to common law fraud and is punitive in nature." Brown Ans. (Doc. 26) at 1 n.1, 15. In an amended answer, Darryl Madison and Madison & Sons make the same demand. *See* Madison Am. Ans. (Doc. 42) at 17–18 ("[N]oting the irony that by seeking disgorgement rather than the statutory penalties expressly designed by Congress to compensate the government for the alleged conduct the of the Defendants, Plaintiff would be permitted to avoid a jury trial in this action, in the name of equity."). The government moves to strike all the defendants' demands for a jury trial, claiming the Seventh Amendment does not extend to non-punitive, equitable relief. *See* MTS Brown Jury Demand; MTS Madison Jury Demand.

Darryl Madison and Madison Tax Services (the Madison Defendants) also plead three affirmative defenses, only two of which the government contests.[1] As relevant here, the Madison defendants first seek a setoff against

---

[1] The government does not move to strike the Madison Defendants' third and fourth affirmative defenses for failure to state a claim upon which relief may be granted, as to Count II and Count IV of the complaint. *See* Madison Am. Ans. at 16–17. Those defenses are improper, however, because "[a] defense which points out a defect in the

any disgorgement claim of damages that they can prove related to the government's "wrongful liquidation of Darryl Madison's securities account, deprivation of their rights to due process, damage to their business resulting from [the government's] gratuitous publication of false, misleading and or incorrect information on their website, outside the course of this judicial proceeding, and not in connection with the collection of taxes, the use of press releases and search engine optimization services to publish such false information across the internet and any related conduct." Madison Am. Ans. at 13 (First Affirmative Defense). Second, and based largely on the foregoing allegations, the Madison Defendants claim that the equitable doctrine of unclean hands bars the government's disgorgement remedy. *Id.* at 14–16 (Second Affirmative Defense). The government moves to strike both affirmative defenses.

## II.    LEGAL STANDARDS

### A. Seventh Amendment

"The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate." FED. R. CIV. P. 38(a). Accordingly, "[t]he trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds

---

plaintiff's prima facie case is not an affirmative defense." *In re Rawson Food Service, Inc.*, 846 F. 2d 1343, 1349 (11th Cir. 1988). I treat those defenses as general denials.

that on some or all of those issues there is no federal right to a jury trial." FED.
R. CIV. P. 39(a)(2). The Seventh Amendment guarantees that "[i]n suits at
common law, . . . the right of trial by jury shall be preserved." The Amendment
thus "embrace[s] all suits which are not of equity or admiralty jurisdiction,
whatever may be the peculiar form which they may assume." *Parsons v.
Bedford*, 3 Pet. 433, 447 (1830); *see SEC v. Jarkesy*, 603 U.S. 109, 122 (2024)
("The Seventh Amendment extends to a particular statutory claim if the claim
is 'legal in nature.' ") (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33,
53 (1989)). "[A]ny seeming curtailment of the right to a jury trial should be
scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

### B. Affirmative Defenses

"An affirmative defense is generally a defense that, if established,
requires judgment for the defendant even if the plaintiff can prove his case by
a preponderance of the evidence." *Wright v. Southland Corp.*, 187 F.3d 1287,
1303 (11th Cir. 1999). Although motions to strike defenses are ordinarily
disfavored, Federal Rule of Civil Procedure 12(f) provides that a "court may
strike from a pleading an insufficient defense or any redundant, immaterial,
impertinent, or scandalous matter." An affirmative defense is "insufficient as
a matter of law" only if it is "patently frivolous" on its face or if "it is clearly
invalid as a matter of law." *Belmer v. EZPawn Fla., Inc.*, 8:20-cv-1470-T-
33SPF, 2020 WL 7419663, at *1 (M.D. Fla. Sept. 28, 2020) (quoting *Microsoft*

*Corp. v. Jesse's Computers & Repair, Inc.*, 211 F.R.D. 681, 683 (M.D. Fla. 2002)). But an affirmative defense is sufficient to overcome a motion to strike if it "puts into issue relevant and substantial legal and factual questions." *Id.* (quoting *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995)); *see also Reyher*, 881 F. Supp. at 576 ("[A] court will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party.").

## III.   ANALYSIS

The government takes issue with all the defendants' demands for a jury trial on the claim for disgorgement and seeks to strike two of the Madison Defendants' affirmative defenses. I address each motion in turn.

### A. Jury Demand

The parties disagree about whether the Seventh Amendment guarantees the defendants the right to a jury trial on the government's claim for disgorgement under 26 U.S.C. § 7402(a). The defendants contend that it does, arguing that, because "a claim for disgorgement is . . . analogous to common law fraud and is punitive in nature," the Seventh Amendment provides for a jury trial. Brown Resp. (Doc. 45) at 3. The government says otherwise, asserting that disgorgement of ill-gotten gains is an equitable remedy that "return[s] those profits to the source from which they were wrongfully

obtained, thus restoring the status quo." MTS Madison Jury Demand at 6. Taking seriously the Supreme Court's direction to "carefully preserve[] the right to trial by jury where legal rights are at stake," *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990), the government nonetheless persuades that the remedy sought here is equitable in nature and thus outside the Seventh Amendment's purview.

### 1. *SEC v. Jarkesy*

Both parties rely principally on the Supreme Court's recent decision in *Jarkesy*, which provides the roadmap for resolving their dispute. I start with the Seventh Amendment, which, "[b]y its text . . . guarantees that in '[s]uits at common law, . . . the right of trial by jury shall be preserved.'" *Jarkesy*, 603 U.S. at 122 (quoting U.S. CONST., amend. VII). The phrase "common law," as used by the Framers, stands "in contradistinction to equity, and admiralty, and maritime jurisprudence." *Id.* (quoting *Parsons*, 3 Pet. at 446); *see Boyle v. Zacharie & Turner*, 6 Pet. 648, 654 (1832) ("[T]he settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in [England], as contradistinguished from courts of law."). A statutory claim like the one at issue here is therefore covered by the Seventh Amendment if it is "legal in nature." *Jarkesy*, 603 U.S. at 122 (quoting *Granfinanciera*, 492 U.S. at 53). To determine whether a claim is legal in nature, courts must "consider the cause of action and the remedy it provides,"

8

with the latter consideration being "more important." *Id.* at 122–23 (quoting *Tull v. United States*, 481 U.S. 412, 421 (1987)).

In *Jarkesy*, "the remedy [was] all but dispositive." *Id.* at 123. There, the Securities and Exchange Commission initiated an enforcement action seeking civil penalties, a form of monetary relief, against an investment firm and its manager for alleged securities fraud violations.[2] *Id.* at 118–19 (explaining that the SEC alleged violations of the Securities Act, the Securities Exchange Act, and the Investment Advisers Act). While "monetary relief can be legal or equitable," the Court explained that "[w]hat determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.' " *Id.* at 123 (quoting *Tull*, 481 U.S. at 422); *see id.* (explaining that "courts of equity could order a defendant to return unjustly obtained funds, [but] only courts of law issued monetary penalties to 'punish culpable individuals' " (quoting *Tull*, 481 U.S. at 422)). A civil sanction that does not "solely . . . serve a remedial purpose," but "also

---

[2] The SEC's final order also "directed [defendants] to cease and desist committing or causing violations of the antifraud provisions, ordered [Jarkesy's firm] to disgorge earnings, and prohibited Jarkesy from participating in the securities industry and in offerings of penny stocks." 603 U.S. at 119. In the proceedings below, the Fifth Circuit described those as "equitable remedies," but explained that "the penalty facet of the action suffices for the jury-trial right to apply to an adjudication of the underlying facts supporting fraud liability." *Jarkesy v. SEC*, 34 F.4th 446, 454–55 (5th Cir. 2022), *aff'd and remanded*, 603 U.S. 109 (2024), *and adhered to*, 132 F.4th 745 (5th Cir. 2024). The Supreme Court did not address disgorgement.

serv[es] either retributive or deterrent purposes, is punishment." *Id.* (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)).

In determining that the SEC's civil penalty functioned as a punishment—and therefore the Seventh Amendment governed—the Court first looked to the Securities Exchange Act's and Investment Advisers Act's preconditions for imposing penalties. The statutes authorized civil penalties based on six factors: "(1) whether the alleged misconduct involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements, (2) whether it caused harm, (3) whether it resulted in unjust enrichment, accounting for any restitution made, (4) whether the defendant had previously violated securities laws or regulations, or had previously committed certain crimes, (5) the need for deterrence, and (6) other 'matters as justice may require.'" *Id.* (quoting 15 U.S.C. §§ 78u–2(c), 80b–3(i)(3)). Because those factors "tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore the victim, such considerations are legal rather than equitable." *Id.*

Next, the Court observed that the relevant statutory "criteria that determine the size of the available remedy" sound in punishment. *Id.* Collectively, the Securities Act, the Securities Exchange Act, and the Investment Advisers Act fix increasing tiers of monetary sanctions based first on whether "the violation involved fraud, deceit, manipulation, or deliberate or

10

reckless disregard for regulatory requirements," and then on whether "those acts also resulted in substantial gains to the defendant or losses to another." *Id.* Those criteria, the Court reasoned, "are also legal in nature" because they "condition[] the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied." *Id.*

As "final proof" that the SEC's desired remedy was punitive, the Court explained that "[a]lthough the SEC can choose to compensate injured shareholders from the civil penalties it collects," nothing in the statutes "obligate[s] [it] to return any money to victims." *Id.* (citing 15 U.S.C. § 7246(a)). "Such a penalty does not 'restore the status quo' and can make no pretense of being equitable." *Id.* (quoting *Tull*, 481 U.S. at 422). Accordingly, the SEC's elected remedy of civil penalties was "a type of remedy at common law that could only be enforced in courts of law," and thus defendants were entitled to a jury trial under the Seventh Amendment. *Id.* at 125.

Turning lastly to the cause of action, the Court explained that securities fraud resembles common law fraud, a legal claim that "must be heard by a jury." *Id.* at 120. "Congress deliberately used 'fraud' and other common law terms of art in the Securities Act, the Securities Exchange Act, and the Investment Advisers Act. *E.g.,* 15 U.S.C. § 77q(a)(3) (prohibiting any practice 'which operates . . . as a fraud')." *Id.* at 125. And "[w]hen Congress transplants a common-law term, the old soil comes with it." *Id.* (quoting *United States v.*

11

*Hansen*, 599 U.S. 762, 778 (2023)). Ultimately, "the close relationship between federal securities fraud and common law fraud confirms that [the] action is 'legal in nature,'" and thus implicated the Seventh Amendment. *Id.* at 126 (quoting *Granfinanciera*, 492 U.S. at 53).

### 2.  Disgorgement under the Internal Revenue Code

The government's statutory claim here bears limited resemblance to the SEC's securities fraud claim in *Jarkesy*, and more importantly, the remedy of disgorgement does not carry the hallmarks of punishment necessary to trigger the Seventh Amendment.

### i.    The tax claim here does not require fraud

Starting with the nature of the government's claim itself, the relevant provision of the Internal Revenue Code provides:

> The district courts of the United States . . . shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction . . . and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws.

26 U.S.C. § 7402(a). The Eleventh Circuit has rejected a "narrow construction of § 7402(a)," holding "that there need not be a showing that a party has violated a particular Internal Revenue Code section" to trigger its application. *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984).

Rather, "[t]he language of § 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws," including a court's ability "to enjoin interference with tax enforcement even when such interference does not violate any particular tax statute." *Id.* (collecting cases); *see United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1354 (11th Cir. 2019) ("Section 7402(a) of the Internal Revenue Code grants federal district courts an array of powers to aid in enforcing the tax laws. . . ."). So, unlike in the securities fraud claims at issue in *Jarkesy*, here "the Government is not required to prove fraud or a violation of § 6701 to obtain injunctive relief" under § 7402(a) and thus need not prove the elements of fraud transplanted from the common law's "old soil." *United States v. Stinson*, 661 F. App'x 945, 952 (11th Cir. 2016); *see also* MTS Madison Jury Demand at 12–13. Instead, "[i]t is sufficient under I.R.C. § 7402 for the Government to prove a pattern of gross negligence or recklessness, so long as injunctive relief is necessary or appropriate for the enforcement of the internal revenue laws." *Stinson*, 661 F. App'x at 952 (citation modified); *see Ernst & Whinney*, 735 F.2d at 1301 (explaining that "the decision to issue an injunction under § 7402(a) is governed by the traditional factors shaping the district court's use of the equitable remedy").

The government's core allegations suggest that the defendants exhibited a "pattern of gross negligence or recklessness" leading to their unjust

enrichment at the expense of the federal treasury. At base, the government contends that "[t]he Defendants' conduct substantially interferes with the enforcement of the internal revenue laws and has caused the United States to issue falsely or fraudulently inflated tax refunds to individuals not entitled to receive them." Compl. ¶ 254. True, the government uses generic language regarding the defendants' "Fraudulent Schemes" throughout the complaint, including in allegations pertinent to disgorgement. *See, e.g.*, Compl. ¶¶ 97–109, 229–230. But only in its claim for injunctive relief under 26 U.S.C. § 7407— which permits the government to rely on violations of certain IRC provisions— does the government allege specific statutory violations amounting to fraud. *See, e.g.*, Compl. ¶ 239(b) ("The Defendants continually and repeatedly engage in conduct subject to penalty under 26 U.S.C. § 6694 by preparing tax returns that understate their customers' tax liabilities and overstate their refunds and credits. . . . with the knowledge that the positions they take on tax returns are unreasonable and lack substantial authority.").

Elsewhere in that same count, though, the government makes clear that the defendants also violated portions of the IRC not predicated on fraudulent conduct. For example, "the Defendants engage in conduct subject to penalty under 26 U.S.C. §§ 6695(b) and 6695(c) for failure to properly sign and identify himself or herself as the paid tax return preparer," *id.* ¶ 239(d), and "engage in conduct subject to penalty under 26 U.S.C. § 6695(g), which penalizes a tax

return preparer who does not exercise due diligence in determining eligibility for earned income tax credits," *id.* ¶ 239(e). Although the government need not prove violations of those underlying provisions for its disgorgement claim under § 7402(a), even if it did, it would not necessarily be required to prove the common law elements of fraud. *See, e.g.*, 26 U.S.C. § 6694(a)(1) (penalizing tax preparers who "knew (or reasonably should have known) of the [unreasonable] position," disclosed on a tax return or claim of refund); *cf. id.* § 6695(b) (excusing preparer's failure to sign if "it is shown that such failure is due to reasonable cause and not due to willful neglect"). Accordingly, the defendants' claim that "the alleged tax fraud in this case is indistinguishable from common law fraud" overlooks that the government need not prove fraud to begin with, even if the defendants' conduct might otherwise qualify. Brown Resp. at 10. Because defendants point to no other common law parallels, this initial inquiry does not suggest the claim's legal nature.

### ii.    Disgorgement is an equitable remedy

The government seeks a return of the defendants' "receipts (in the form of fees earned by engaging in false or fraudulent conduct) for preparing federal tax returns that make false or fraudulent claims." Compl. ¶ 257. Because this disgorgement request sounds in equity, the remedy proves "all but dispositive" here. *Jarkesy*, 603 U.S. at 123.

At the outset, the Madison Defendants question the propriety of disgorgement because § 7402(a) "does not specifically refer to or authorize [it] as a remedy," and because the statute's "enforcement" purpose "tend[s] to suggest that economic claims flowing from this provision are punitive / legal in nature." Madison Resp. MTS Jury Demand (Doc. 58) at 3–4. I disagree. Section 7402(a) authorizes courts "to make and issue . . . writs and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." Under the *ejusdem generis* canon, because the specifically enumerated powers are equitable in nature, so too are "other orders and processes." *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018) ("[W]here . . . a more general term follows more specific terms in a list, the general term is usually understood to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (citation modified)). Nor does "enforcement" restrict the open-ended authorizations to legal claims, since the modifying "enforcement" phrase attaches equally to the enumerated equitable remedies. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 19, at 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.").

16

But even though § 7402 authorizes equitable relief here, courts do not exercise "freewheeling power to fashion new forms of equitable remedies" under "general statutory grants of equitable authority." *Trump v. Hawaii*, 585 U.S. 667, 714 (2018) (Thomas, J., concurring). Instead, courts must "analyze[] whether a particular remedy falls into 'those categories of relief that were *typically* available in equity.'" *Liu v. SEC*, 591 U.S. 71, 78–79 (2020) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)). Historically, "[e]quity courts . . . routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names." *Id.* at 79 (comparing traditional remedies of "accounting" and "restitution"). So, although "disgorgement" "is a 20th-century invention," at least in name, *see id.* at 94 (Thomas, J., dissenting), and represents a "'limited form of penalty insofar as it takes money out of the wrongdoer's hands," the Supreme Court has "situate[d] the remedy squarely within the heartland of equity" because it focuses on restoring the status quo, much like the traditional equitable remedies of accounting and restitution, *id.* at 80 (quoting *Tull*, 481 U.S. at 424); *see also Smith v. Vodges*, 92 U.S. 183, 186 (1875) ("Where money has been misappropriated, the general rule of equity is, that those wronged may pursue it as far as it can be traced, and may elect . . . to recover the money."); *accord, e.g., SEC v. Almagarby*, 92 F.4th 1306, 1320 (11th Cir. 2024) ("[D]isgorgement

17

sounds in equity and[ ] stripping wrongdoers of ill-gotten profits is consistent with equitable practice.").

Thus, "[b]ecause § 7402 encompasses a broad range of powers necessary to compel compliance with the tax laws . . . disgorgement is an available remedy" to the IRS, *United States v. Stinson*, 239 F. Supp. 3d 1299, 1326 (M.D. Fla. 2017) (citation modified), *aff'd*, 729 F. App'x 891 (11th Cir. 2018), and it functions as "an equitable remedy intended to prevent unjust enrichment," *id.* at 899 (*quoting SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2018)). Based on this conventional understanding, courts before *Jarkesy* had little trouble concluding "that disgorgement, in the context of § 7402, is an equitable remedy not [] triable by a jury." *United States v. Meyer*, 376 F. Supp. 3d 1290, 1295 (S.D. Fla. 2019); *United States v. RaPower-3, LLC*, 294 F. Supp. 3d 1238, 1240 (D. Utah 2018) ("[D]isgorgement is equitable and is not tried by a jury."), *aff'd* 960 F.3d 1240 (10th Cir. 2020).

*Jarkesy* does not alter that conclusion. Rather, *Jarkesy* recognizes that "courts of equity could order a defendant to return unjustly obtained funds," exactly what disgorgement under § 7402 accomplishes in this context.[3] 603

---

[3] In other contexts, too, courts post-*Jarkesy* have concluded that disgorgement claims do not trigger the Seventh Amendment's protections. *See, e.g.*, *Nat'l Presto Indus., Inc. v. U.S. Merchants Fin. Grp., Inc.*, 121 F.4th 671, 678–80 (8th Cir. 2024) (holding that district court properly denied request for jury trial on Lanham Act claim seeking disgorgement (citing *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019)); *Proofpoint, Inc. v. Vade USA, Inc.*, No. 23-16085, 2024 WL 4003096, at *1 (9th Cir. Aug. 30, 2024) ("[T]he Seventh Amendment extends to a

U.S. at 123. In doing so, and in contrast to the securities fraud statutes which "condition[ed] the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied," *id.*, the government seeks only the return of the defendants' "receipts (in the form of fees earned by engaging in false or fraudulent conduct) for preparing federal tax returns that make false or fraudulent claims," Compl. ¶ 257; *Kokesh v. SEC*, 581 U.S. 455, 458–59 (2017) ("Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'" (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a (A.L.I. 2010)). Because disgorgement here neither varies nor increases based on the defendants' relative culpability, the key underlying "considerations" are not legal in character. *Jarkesy*, 603 U.S. at 124.

Further, returning the amount of the net gain to the United States Treasury also works primarily to "restore the status quo," *Tull*, 481 U.S. at 422, and adequately "restore[s] the victim," *Jarkesy*, 603 U.S. at 124. Unlike in *Jarkesy*, where the SEC was "not obligated to return any money to [non-governmental] victims," *id.*, the direct victim of the defendants' actions is the federal government. As the government's complaint plausibly alleges, the defendants "deduct their return preparation fees directly from their customers'

---

statutory claim only if that particular claim is legal in nature, which disgorgement is not." (citation omitted)).

refunds."[4] Compl. ¶ 50; *see id.* ¶ 254 ("The Defendants have unjustly profited at the expense of the United States by subtracting their tax preparation fees from these bogus refunds."). While the balance of the "bogus refunds" also represents an amount owed to the IRS, the ill-gotten gains necessarily form a portion of the siphoned-off tax revenues, for which the government requests "a period of discovery to determine the appropriate amount of disgorgement."[5] Compl. ¶ 258(h).

More still, § 7402's disgorgement remedy is "in addition to and not exclusive of any and all other remedies of the United States in such courts or

---

[4] In its motions, the government claims that the defendants "contract with a third party, in this case Refund Advantage, to process their customers' tax refunds. . . . From each refund, Refund Advantage then subtracts 1) its per-return refund processing fee, 2) the per-return fee that is transmitted to the provider of the tax preparation software that the Defendants use, and 3) the Defendants' tax preparation fee. The remaining balance is then transmitted to the customer." MTS Madison Jury Demand at 2–3. The Madison Defendants suggest that the third-party routing, which is absent from the complaint, means that the defendants are not the direct recipients of ill-gotten gains. *See* Madison Resp. MTS Jury Demand at 8. I disagree. The defendants can be unjustly enriched even if the refunds passed through another entity first. *See, e.g., United States v. Lawrence*, No. 15-62233-CIV, 2016 WL 5390569, at *6 (S.D. Fla. Sept. 27, 2016) (rejecting defendant's argument "that the United States cannot obtain disgorgement from him because customers paid his companies, not him personally, for tax preparation").

[5] At first glance, disgorging the defendants' "receipts" or "fees" appears to target their full revenues, not just profits. Some courts view this as the proper scope of disgorgement in SEC and FTC actions. *See, e.g., FTC v. Washington Data Res., Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (per curiam) (holding that the correct measure of disgorgement is net revenue, not net profit, because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." (citation omitted)). Other "courts limited awards to the net profits from wrongdoing, that is, 'the gain made upon any business or investment, when both the receipts and payments are taken into the account.'" *Liu*, 591 U.S. at 83 (quoting *Rubber Co. v.*

otherwise to enforce such laws," whether that be injunctive relief or penalties. Here, as was proper in courts of equity, the government seeks disgorgement as a monetary remedy "incidental to or intertwined with injunctive relief," such as in "actions for disgorgement of improper profits." *See Chauffeurs*, 494 U.S. at 570–71. In addition, the IRS *could* seek fines above and beyond the defendants' ill-gotten gains through the IRC's penalty-enabling provisions. *See, e.g.*, 26 U.S.C. §§ 6694, 6695, and 6701, and if it did, the defendants would likely be entitled to a jury. *See, e.g.*, *Ross v. Bernhard*, 396 U.S. 531, 537–38 (1970) ("[W]here equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims."). But that the government does not, and cannot, seek to further penalize the defendants through a disgorgement remedy supports a conclusion that "the nature of the issue to be tried" and the relief sought is equitable. *Id.* at 538.

The defendants push back, arguing that disgorgement under § 7402, like the penalty in *Jarkesy*, aims "to enforce the laws of the internal revenue service

---

*Goodyear*, 9 Wall. 788, 804 (1870)); *see id.* at 100 (Thomas, J., dissenting) (arguing that if disgorgement is treated as an equitable remedy, "the order should be limited to each petitioner's profits."). At this stage, I need not decide the proper amount of disgorgement and thus do not decide whether defendants may deduct expenses from net "receipts" or "fees," which involves assessing whether " 'the entire profit of a business or undertaking' results from the wrongful activity." *Id.* at 84 (quoting *Root v. Railway Co.*, 105 U.S. 189, 203 (1882)).

by putting fraudulent tax return prepares out of business and dissuading other tax preparers from crossing the line." Brown Resp. at 9. That's true, as far as it goes. Insofar as the defendants' " 'entire profit of a business or undertaking' results from the wrongful activity," *Liu*, 591 U.S. at 84 (quoting *Root*, 105 U.S. at 203), that goes to the amount of disgorgement, not the remedy's legal or equitable categorization. It also says little of the remedy's equitable character where the government also seeks injunctions that would put Madison Tax Services out of business. *See, e.g.*, Compl. ¶ 258(d)(i) (seeking to enjoin the defendants from "[p]reparing, assisting in the preparation of, or directing the preparation of federal tax returns"). The defendants do not suggest that the requested injunctive relief is legal in character, even though it would almost certainly cause other tax preparers to pause before flouting the IRC.

In a final effort to undercut disgorgement as an equitable remedy, the defendants rely on the Supreme Court's decision in *Kokesh v. SEC*, 581 U.S. 455 (2017), which addressed the "sole question" of "whether disgorgement, as applied in SEC enforcement actions, is subject to [28 U.S.C.] § 2462's limitation period" for "any 'action . . . for the enforcement of any civil fine, *penalty*, or forfeiture, pecuniary or otherwise." 581 U.S. at 457, 461 n.3 (quoting 28 U.S.C. § 2462) (emphasis added). There, "SEC disgorgement constitute[d] a penalty within the meaning of § 2462" because it was imposed for violations of "public laws," served "punitive purposes," and was "not compensatory" given that the

22

court retained discretion over how to distribute the disgorged profits. *Id.* at 463–65. Further, "SEC disgorgement sometimes exceed[ed] the profits gained as a result of the violation," and thus left the defendants worse off, deviating from a non-punitive return to the status quo. *Id.* at 466.

Despite its appeal to broader principles, "*Kokesh* is a statutory analysis of terms" that "certainly did not discuss or overrule the longstanding precedent of categorizing disgorgement as an equitable remedy." *RaPower*, 294 F. Supp. 3d at 1241–42. In fact, "the *Kokesh* Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles," and thus "has no bearing on the [government's] ability to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains." *Liu*, 591 U.S. at 85–86. That's particularly true here, where disgorgement under § 7402 must be "governed by the traditional factors shaping the district court's use of the equitable remedy." *Ernst & Whinney*, 735 F.2d at 1301. I therefore do not think *Kokesh*'s narrow holding applies to an IRS disgorgement order that seeks to restore the status quo through the return of the federal government's lost tax revenue without leaving the defendants "worse off." *See Kokesh*, 581 U.S. at 466.

Ultimately, because such a disgorgement order only requires the "defendant[s] to return unjustly obtained funds," without additional hallmarks

of a penalty, I conclude that the Seventh Amendment is not implicated here and grant the government's motions to strike the defendants' jury demand.

### B. Affirmative Defenses

In addition to the defendants' demands for a jury trial, the government also moves to strike the Madison Defendants' unclean hands and setoff affirmative defenses as improper and based on irrelevant, extraneous matters.

### 3. Unclean Hands

The Madison Defendants aver that the government's conduct bars its requested equitable relief under the doctrine of unclean hands. More specifically, the Madison Defendants plead that the government "wrongfully seized and liquidated [Madison's] stock account, deprived him of notice, due process and the opportunity to defend himself against their claims resulting in damages in excess of $4 million." Madison Am. Ans. at 14 (Second Affirmative Defense). Allegedly compounding those primary injuries with a "defamatory campaign," Madison says the government "publish[ed] the instant complaint, which contains a vast amount of disparaging, unproven, factually incorrect and or misleading information on their website coupled with a link to the complaint." *Id.* at 14–15. Madison's boundless description of the government's alleged wrongdoing foreshadows trouble for his theory of defense.

Of course, it is a well-trodden maxim that "[h]e who comes into equity must come with clean hands." *Keystone Driller Co. v. Gen. Excavator Co.*, 290

U.S. 240, 241 (1933). To prevail on an unclean hands defense, though, "a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 801 (11th Cir. 2015). "[C]ourts require the connection between the unclean-hands conduct and the matter in litigation to be very close." *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 11233137, at *3 (S.D. Fla. June 26, 2015).

At the outset, and before engaging with these standards, the government posits that "[u]nclean hands is unavailable against the government in suits to 'vindicate the public interest.'" MTS Aff. Def. at 4 (citing *United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 773 (N.D. Tex. 2002)). To be sure, some courts have suggested as much. *See, e.g., SEC v. Gulf & Western Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980) ("[T]he doctrine of unclean hands . . . may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest."); *SEC v. Kirkland*, No. 606-CV-183ORL, 2006 WL 8449839, at *1 (M.D. Fla. Sept. 6, 2006) ("[G]enerally, motions to strike are granted when the doctrine of unclean hands has been asserted against a government agency carrying out its congressionally mandated duties."). But the Eleventh Circuit has not formally adopted the government's view, at least to the far-reaching limits it proposes. Instead, the government is presumed to "come[] into court with clean hands

and is entitled to the equitable relief it obtained" unless it "did something which in good conscience it should not have done, or failed to do something fair dealing required it to do." *United States v. Second Nat'l Bank of N. Miami*, 502 F.2d 535, 548 (5th Cir. 1974);[6] *SEC v. Cuban*, 798 F. Supp. 2d 783, 788 (N.D. Tex. 2011) ("*Second National Bank* does not support the conclusion that the affirmative defense of unclean hands can never be invoked against the SEC when . . . [it] is attempting to enforce a congressional mandate in the public interest, such as in an enforcement action.").

Even on this more modest view of the government's position, the Madison Defendants fail to adequately plead an unclean hands affirmative defense. To begin, the allegations are not "directly related to the claim" at issue here. *Bailey*, 776 F.3d at 801. As the government's complaint details, "[o]n August 12, 2019, the IRS assessed penalties against Madison under 26 U.S.C. § 6694(b) for his willful or reckless conduct in preparing tax returns in 2015, 2016, and 2017." Compl. ¶ 26. The government does not seek to reassess penalties against Madison for those tax years or to collect them through the present action. Instead, as the IRC provides for, the government requests equitable relief which is "not exclusive of any and all other remedies of the

---

[6] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

United States in such courts or otherwise to enforce such laws." 26 U.S.C. § 7402(a). According to the government, Madison's unlawful tax preparation activities continued into tax years 2019–2024, a time period that did not form the basis for the penalties or purported "wrongful[] seiz[ure]" of Madison's securities accounts. *See, e.g.*, Compl. ¶¶ 31, 121–164. Thus, I agree that "[w]hether the IRS did or did not wrongfully seize property in relation to a penalty assessed against Mr. Madison has no bearing" on the government's entitlement to injunctive relief or disgorgement based on separate, ongoing violations of federal tax law for different tax years. *See* Reply MTS Aff. Def. at 2.

Likewise, Madison's contention that the government's complaint and press release amount to a "defamatory campaign to destroy [Madison's] business and livelihood" is without merit, even if perhaps more "directly related" to the claim. Madison Am. Ans. at 15. First, Madison provides no support for the proposition that defamation—a common-law tort—is actionable as an affirmative defense to a claim for equitable relief. Second, as the government points out, even if it were, the government has not waived its sovereign immunity for defamation claims generally. *Cf. Ware v. United States*, 838 F. Supp. 1561, 1563 (M.D. Fla. 1993) ("[A]ny claims of defamation are expressly excluded from the [Federal Tort Claims Act's] limited waiver of sovereign immunity."); *Burns v. United States*, 809 F. App'x 696, 701 (11th Cir.

27

2020) (same). Third, insofar as Madison attacks the complaint for "mak[ing] numerous false, misleading and damaging statements about the honesty and integrity of all of the defendants," Madison. Am. Ans. at 15, those statements are categorically immune from liability under the litigation privilege doctrine, which "affords absolute immunity for acts occurring during the course of judicial proceedings." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1274 (11th Cir. 2004) (noting that Florida's litigation privilege "developed to protect litigants and attorneys from liability for acts of defamation"). Finally, even assuming the government's related press release falls outside the scope of immunity, Madison does not allege that the press release includes false statements. Rather, as Madison concedes, the release "identifies [the government's] claims as 'alleged'" and "refers readers to the linked complaint." Madison Am. Ans. at 15; *see also* Hornbuckle Decl. (Doc. 63-1) ¶ 2 (explaining that the DOJ Office of Public Affairs "publishes thousands of DOJ press releases each year regarding DOJ activities, including injunctions sought by the United States"). Without any allegation of falsity, Madison's defamation defense fails.

Because the Madison Defendants' unclean hands defense "is clearly invalid as a matter of law," I grant the government's request to strike the affirmative defense. *Microsoft*, 211 F.R.D. at 683.

### 4. Setoff

Relying on the same purportedly wrongful government conduct above, the Madison Defendants allege "entitle[ment] to a setoff against any disgorgement claim Plaintiff may be able to establish in this action" equal to damages flowing from (among other alleged harms) the liquidation of Madison's securities account and harm to his reputation and business. Madison Am. Ans. at 13; Madison Resp. Aff. Def. (Doc. 57) at 2, 10 (arguing that Madison's assets were subject to a "wrongful levy"). The government moves to strike the defense as improper, unrelated to the claims at issue, and insufficiently pleaded. *See* MTS Aff. Def. at 9–10. I agree that "set off" is not a valid affirmative defense under the circumstances and grant the motion to strike on that basis.

Ordinarily, a defendant seeking to limit his overall liability for damages may raise a setoff either as an affirmative defense in a contract action or as a counterclaim in a tort action. *See Puck v. Silverman*, 2023 WL 9228323, at *2 (S.D. Fla. Dec. 22, 2023) ("[A] review of the case law shows that courts [in contract actions] routinely recognize setoff as a valid affirmative defense under Florida law"); *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 F. App'x. 591, 598 (11th Cir. 2006) (per curiam) (In certain tort actions, "set-off is not an affirmative defense to be considered by the jury but is a determination regarding damages to be made by the court after the verdict is rendered."

29

(quoting *Felgenhauer v. Bonds*, 891 So.2d 1043, 1045 (Fla. 2d DCA 2004)). Where a defendant pleads setoff as an affirmative defense, he must "raise[] matters extraneous to the plaintiff's *prima facie* case." *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988); *see also S. Broad. Grp., LLC v. Gem Broad., Inc.*, 145 F. Supp. 2d 1316, 1331 n.9 (M.D. Fla. 2001) (explaining that a demand to offset damages "aris[es] out of a transaction extrinsic to plaintiff's cause of action"), *aff'd sub nom. S. Broad. v. GEM Broad.*, 49 F. App'x 288 (11th Cir. 2002).

To be fair, the defendants here seek to limit their potential liability based on an "extrinsic transaction,"[7] namely the IRS's earlier assessment of civil penalties against Madison. Unlike in a typical setoff scenario, though, the Madison Defendants attempt to reduce their exposure to statutory, equitable remedies rather than contract or tort-based damages. The IRC's text and structure counsel against such a defense in this situation, where Madison's

---

[7] To the extent the Madison Defendants also ask to set off any disgorgement with damages from "Plaintiff's gratuitous publication of false, misleading and or incorrect information on their website, outside the course of this judicial proceeding, and not in connection with the collection of taxes, the use of press releases and search engine optimization services to publish such false information across the internet and any related conduct," such conduct is intrinsic to the government's filing of the present action. *See* Madison Am. Ans. at 13. More, the defendants' allegation that the government uses "search engine optimization services" is conclusory and without support. *See* Hornbuckle Decl. ¶ 4 ("The Office of Public Affairs does not pay to advertise its press releases or boost search results on internet platforms."). The defendants' post-answer efforts to bolster that allegation are futile, as pleadings cannot be supplemented through a response brief. *See, e.g., Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) (per curiam).

primary complaint is that the IRS wrongfully liquidated his securities account without adequate notice. *See* Madison Am. Ans. at 13. On those facts, I agree with the government's view that Madison's recovery requires "an independent cause of action." Reply to MTS Aff. Def. (Doc. 63) at 2. Under the IRC, an aggrieved party may bring a refund action in federal district court if "property was wrongfully levied upon [by the IRS].'" 26 U.S.C. § 7426(a)(1).

Madison has not brought an action to recover the wrongfully levied account, nor does he frame this defense under the statutory provision that might otherwise authorize it. *See id.* § 7426(b)(2)(B) (authorizing court to "grant a judgment for the amount of money levied upon"). Regardless, such an action would challenge the substance and procedure of a separate IRS penalty, not equitable relief which exists "in addition to and not exclusive of" that penalty. 26 U.S.C. § 7402(a). The Madison Defendants may not circumvent the IRC's procedures by styling a damages action as an affirmative defense, and I therefore strike the setoff defense.

## IV.    CONCLUSION

The government persuades that the defendants' answers include legally inviable demands and defenses. First, the Seventh Amendment does not provide a right to a jury trial on disgorgement claims under the IRC. Second, neither unclean hands nor setoff is a proper affirmative defense on the facts alleged by the parties. Accordingly, the following is **ORDERED:**

1. The United States' Motions to Strike Defendants' Jury Demands (Docs. 31, 51) are **GRANTED.**

2. The United States' Motion to Strike Affirmative Defenses (Doc. 50) is **GRANTED.** Defendants Darryl Madison and Madison Tax Services' First Affirmative Defense (Setoff) and Second Affirmative Defense (Unclean Hands) are **STRICKEN.**

   **ORDERED** in Tampa, Florida, on December 15, 2025.

Kathryn Kimball Mizelle
United States District Judge